# 14-1759-cv

## United States Court of Appeals

*for the*

## Second Circuit

JANE ROE, individually and on the behalf of all others similarly situated,
JANE DOE, individually and on the behalf of all others similarly situated,

*Plaintiffs-Appellants,*

— v. —

EMPIRE BLUE CROSS BLUE SHIELD, ST. JOSEPH'S MEDICAL CENTER,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX OF DEFENDANT-APPELLEE ST. JOSEPH'S MEDICAL CENTER

CLIFTON BUDD & DEMARIA, LLP
*Attorneys for Defendant-Appellee*
*St. Joseph's Medical Center*
The Empire State Building
350 Fifth Avenue, 61st Floor
New York, New York 10118
(212) 687-7410

ARTHUR J. ROBB
*Of Counsel*

**i**

# TABLE OF CONTENTS

**Page**

Notice of Motion, by Defendant St. Joseph's
    Medical Center, for an Order Dismissing the
    Complaint, dated September 30, 2013 ................... SA-1

Exhibit A to Motion -
Plaintiff's Complaint, dated June 19, 2012 ............ SA-3

Exhibit B to Motion -
Excerpts of Empire Direct POS Plan for St.
Joseph's Medical Center ........................................ SA-15

Exhibit C to Motion -
Pre-Motion Conference Transcript, dated
November 7, 2012 ................................................. SA-19

SA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

JANE ROE AND JANE DOE, individually and       :
on behalf of all others similarly situated.    :
                                               :
                                               :
                        Plaintiffs,            :      **Civil Action No.: 12-cv-4788**
                                               :
            -against-                          :
                                               :
EMPIRE BLUE CROSS BLUE SHIELD and              :
ST. JOSEPH'S MEDICAL CENTER,                   :
                                               :
                        Defendants.            :
------------------------------------------------------------ x

**NOTICE OF DEFENDANTS' MOTION TO DISMISS AND/OR STIKE CLASS
ALLEGATIONS**

      **PLEASE TAKE NOTICE** that pursuant to F.R.Civ.P. 12(b)(6), defendant St.

Joseph's Medical Center moves this Court before the Honorable Nelson S. Roman for an Order

dismissing the Complaint, and awarding such other and further relief as the Court deems proper

and just.  The grounds for the motion are: (1) nothing in ERISA (though Section 510, 404, or

otherwise) requires Defendants to ensure that Plaintiffs are eligible to receive exactly the same

benefits that other married couples may receive; and (2) Plaintiffs' class allegations are so

facially implausible, the Court should strike them in the event that any portion of the Complaint

survives this motion.

      The following true copies are attached as exhibits in support of the motion:

| Exhibit: | Description: |
|---|---|
| A | Plaintiffs' Complaint |
| B | Empire Direct POS Plan for St. Joseph's Medical Center (Excerpted) |

SA-2

**Exhibit:**                                   **Description:**

   C                    Pre-motion Conference Transcript, November 7, 2012

      A Memorandum of Law is submitted herewith.


Dated: September 30, 2013
       New York, New York

                                   Respectfully submitted,
                                   CLIFTON BUDD & DeMARIA, LLP
                                   Attorneys for St. Joseph's Medical Center


                         By: _____
                                   Howard G. Estock
                                   Arthur J. Robb
                                   Eva A. Rasmussen
                                   The Empire State Building
                                   350 Fifth Avenue, 61st Floor
                                   New York, New York 10118
                                   (212) 687-7410

SA-3

JUDGE CASTEL

12 CIV 4788

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RECEIVED
JUN 19 2012
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| JANE ROE and JANE DOE, individually and on the behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, vs. | CLASS ACTION COMPLAINT FOR RELIEF UNDER ERISA |
| EMPIRE BLUE CROSS BLUE SHIELD and ST. JOSEPH'S MEDICAL CENTER, | |
| Defendants. | |

Plaintiffs Jane Roe ("Roe") and Jane Doe ("Doe") (collectively "Plaintiffs"), by and through their attorneys, Newman Ferrara LLP, as and for their Class Action Complaint, allege upon knowledge, information, and/or belief as follows:

### NATURE OF THE ACTION

1. This is a class action brought pursuant to Section 502 of the Employment Retirement Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against Empire Blue Cross Blue Shield ("BCBS") and St. Joseph's Medical Center ("St. Joseph's") as sponsors and/or administrators of the Direct POS Plan for Saint Joseph's Medical Center (the "Plan"), for unlawful interference with the rights accorded to Plaintiffs by ERISA, by denying benefits in a discriminatory manner based on their status as partners in a legally recognized same sex marriage.

2. At all relevant times, St. Joseph's was the Plan sponsor responsible for providing health care benefits to the employee Plan participants and beneficiaries, including the Plaintiffs and other similarly situated individuals, who, under the terms of the Plan, were and are entitled to medical benefits.

SA-4

3.     At all relevant times, BCBS was the Plan administrator responsible for administering the Plan's benefits for Plan participants and beneficiaries, including the Plaintiffs and other similarly situated individuals, who, under the terms of the Plan, were and are entitled to medical benefits.

4.     Despite the fact that New York State recognizes same-sex marriage, St. Joseph's and BCBS maintained a provision of the Plan excluding same-sex spouses from eligible dependents of Plan participants.  As such, by imposing and/or enforcing this provision, Defendants St. Joseph's and BCBS discriminatorily, imprudently and unlawfully interfered with benefits to which Plaintiffs were entitled in violation of ERISA §§ 409 and 510.

5.     Plaintiffs brings this as a class action on behalf of all: (a) all persons who are participants in or beneficiaries of a BCBS insurance plan, and who were or might be denied medical benefits coverage as a result of an employer's policy that excludes coverage for same-sex spouses; and (b) all participants and beneficiaries of the Plan who were denied medical benefits coverage as a result of St. Joseph's policy excluding coverage for same-sex spouses.

6.     Accordingly, under ERISA § 502(a)(3), Plaintiffs seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, reinstatement of benefits, past, present, and future, as well as attorney's fees and costs.

## PARTIES

**Plaintiffs**

7.     Plaintiff Roe, at all times relevant hereto, was and is an employee of St. Vincent's Westchester , a division of St. Joseph's, and a resident of Westchester County, New York, and a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).

-2-

SA-5

8.    Plaintiff Doe, at all times relevant hereto, was and is the legal spouse of Plaintiff Roe and a resident of Westchester County, New York, and is a proper "beneficiary" of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).

**Defendants**

9.    Defendant St. Joseph's is the Plan "sponsor" within the meaning of ERISA), and has its principal place of business located 127 South Broadway, Yonkers, New York 10701. Through its administration and discretionary management of the Plan, St. Joseph's is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

10.    Defendant BCBS is the Plan "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A), and maintains its principal place of business at 633 Third Avenue, New York, New York 10017.

## JURISDICTION AND VENUE

11.    **Subject Matter Jurisdiction.**  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or are subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

13.    **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the conduct

-3-

SA-6

and/or fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or maintain their primary place of business in this District.

## CLASS ACTION ALLEGATIONS

14.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who are participants in or beneficiaries of BCBS insurance plans in the State of New York who were or might be denied medical-benefits coverage as a result of an employer's policy that excludes coverage for same-sex spouses.

15.     Plaintiffs also bring this action as a class action pursuant to Rules 23(a), and (b)(2) of the on behalf of themselves and a subclass of St. Joseph's Plan participants and beneficiaries who have been or will be affected by St. Joseph's policy of excluding coverage for same-sex spouses (the "Subclass").

16.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class and Subclass because:

    a.     *Numerosity.* The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of legally married, same-sex couples who reside in New York. Plaintiffs submit that a great number of these individuals have sought but have been denied (or will be denied) medical benefits under a BCBS administered plan where the employer excludes coverage for same-sex spouses. As for the Subclass, Plaintiffs are not presently able to ascertain the number of St. Joseph's

-4-

SA-7

employees and/or Plan participants negatively affected by St. Joseph's policy but believe numerosity will be satisfied following discovery on this issue.

    b.    ***Commonality.*** Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions affecting solely individual members of the Class and Subclass. Among the questions of law and fact common to the Class and Subclass are:

    i.   Whether Defendants violated ERISA;

    ii.   Whether Defendants discriminated against Plaintiffs in violation of 29 U.S.C. § 1140;

    iii.   Whether the Defense of Marriage Act (DOMA), 28 U.S.C. § 1738C, is unconstitutional;

    iv.   Whether Defendants are liable to Plaintiffs despite DOMA; and

    v.   The extent and calculation of damages caused by Defendants' conduct.

    c.    ***Typicality.*** Plaintiffs' claims are typical of the claims of the members of the Class and Subclass because the Plaintiffs and the other members of the Class and Subclass, were or will be denied benefits due to their status as legally recognized same-sex spouses as a result of Defendants' wrongful and discriminatory policies, in violation of ERISA as complained of herein.

    d.    ***Adequacy.*** Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class or Subclass.

-5-

SA-8

17.     Class action status is also warranted under the other subsections of Rule 23(b)(2) because: (a) Defendants have taken actions which apply to the Class universally, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (b) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## STATEMENT OF FACTS

### *Background*

18.     Plaintiff Roe has been an employee of St. Joseph's from September 2007 to present, and a participant in the Plan on all pertinent dates.

19.     The Plan is an Empire BCBS Direct Group POS Plan administrated by BCBS and sponsored by St. Joseph's.

20.     On or about October 15, 2011, following the passage of N.Y. DOM. REL. LAW § 10-a(1) (2011), otherwise known as the Marriage Equality Act, which legalized same-sex marriages in New York and mandated full legitimacy be accorded to all same-sex marriages with respect to all applicable laws, Plaintiff Roe married her partner Plaintiff Doe.

21.     On or about December 16, 2011, during the open period of Plan enrollment, Plaintiff Roe made a request to St. Joseph's that her spouse, Plaintiff Doe, be added as a dependent to her medical benefits coverage so that she could receive the benefits that are provided by the Plan as such benefits are regularly provided to spouses under the Plan.

22.     On or about December 22, 2011, Plaintiff Roe was notified verbally by Carmela Pisanello of St. Joseph's Human Resources that her spouse would be denied coverage because the Plan expressly excluded "same-sex" couples as eligible dependents of the Plan's participants.

-6-

Plaintiff Roe requested that the denial be put in writing and, on or about February 8, 2012, she received a letter from Ms. Pisanello confirming the denial of coverage.

     23.    In accordance with the grievance procedures set forth in the Plan, on April 12, 2012, Plaintiff Roe sent "Level 1" grievance letters to both BCBS and St. Joseph's complaining about the denial of coverage and requesting that the determination be reversed. Despite the Plan requirement that BCBS respond within fifteen (15) calendar days, Plaintiffs received no response to their Level 1 grievance.

     24.    Again, in accordance with the same grievance procedures, on May 23, 2012, Plaintiff Roe sent a "Level 2" grievance letter to both BCBS and St. Joseph's complaining once more about the denial of coverage and requesting reconsideration.

     25.    On or about May 29, 2012, BCBS responded to the Level 2 grievance letter in writing, informing Plaintiff Roe that the denial of coverage would not be reversed because "under [the Plan], same sex spouse and domestic partner is an EXCLUSION under the benefit."

***The Law***

     26.    New York State law consummates and recognizes the marriage of same-sex couples as legal and binding and requires that those marriages should be accorded the same rights, benefits and privileges as a heterosexual marriages pursuant to the Marriage Equality Act.

     27.    Because DOMA unlawfully discriminates against same-sex spouses, it is unconstitutional and therefore should not be used as a basis to deny Plaintiffs their right to medical benefits under the Plan. In the absence of DOMA, ERISA would (and should under the Tenth Amendment) follow the law of New York and thus mandate non-discriminatory coverage.

     28.    However, despite the law of New York which recognizes same-sex marriage, ERISA currently looks first to federal law in defining its terms. Here, the only federal law that

Class Action Complaint
for Violations of ERISA

speaks to the definition of marriage is DOMA. Unlike the law of New York, DOMA provides that marriage, for the purpose of federal law, exists only between one man and one woman, and defines spouse as an individual of the opposite sex. 1 U.S.C.S. § 7 (1996).

29.     In a recent First Circuit opinion, the Court of Appeals found that Section 1 of DOMA, which defines marriage narrowly as between two individuals of the opposite sex, was unconstitutional on the basis that the extreme economic burden placed on gay citizens seeking medical benefits, tax benefits and spousal death benefits outweighed the Congressional purposes of DOMA which violated the Equal Protection Clause. Furthermore, the First Circuit found that DOMA violated the Tenth Amendment because its purposes, such as maintaining the morality and tradition of heterosexual marriage, were not so substantially compelling as to countervail the burdens of choice which DOMA inflicts on states with legalized same-sex marriage on a traditionally state regulated matter. *See Common Wealth of Massachusetts v. U.S. Dep't of Health and Human Services,* 698 F.Supp.2d 234 (2012).

30.     Similarly, on June 6, 2012, DOMA was found unconstitutional by Judge Barbara Jones of the Southern District of New York, who, like the First Circuit, determined that the governmental goals set forth by DOMA were illegitimate. Judge Jones adduced that DOMA had barely any significance with respect to three of the four goals proffered by Congress, and the fourth could not hold-up in lieu of DOMA's impact on homosexuals, a systematically oppressed demographic. *See Windsor v. U.S.,* 2012 WL 2019716 (S.D.N.Y. 2012).

31.     This decision follows on the heels of another decision by a federal appeals judge in California who found that, as applied to a federal employee's denial of benefits to her same-sex spouse, DOMA was unconstitutional as it violated of the Equal Protection Clause. The judge in that case declared that discriminatory purposes of DOMA did not outweigh the negative

-8-

SA-11

effects the statute has on homosexuals as a protected class. *See Golinsky v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012).

32.     Because DOMA is unconstitutional, its application in favor of New York State law is improper.

**Defendants' Policy is Unlawful**

33.     St. Joseph's and BCBS should not be permitted to continue the discriminatory and unconstitutional practice of denying benefits to spouses in same-sex marriages while providing those same benefits for couples of the opposite sex.

34.     The denial of benefits by the Plan's administrator and sponsor has resulted in an adverse action to Plaintiffs by interfering with their exercise of rights under the Plan and thus the Plaintiffs have been injured and seek redress from Defendants under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including, without limitation, injunctive relief, equitable relief and attorney's fees.

35.     Defendants were and are fiduciaries of the Plan and responsible for administering and sponsoring the Plan, including having discretionary authority and control with respect to the terms, management and administration of the Plan, pursuant to 29 U.S.C. § 1002(21)(A).

36.     The Plan states, as aforementioned, that dependents, who are same-sex spouses of Plan participants, are ineligible to receive benefits. The Defendants, at all relevant dates, have condoned and maintained that provision despite its clearly discriminatory purpose and effect.

37.     As fiduciaries of the Plan, Defendants had the responsibility and duty of providing benefits to Plan participants and beneficiaries prudently and for the sole purpose of caring for the interests of those individuals pursuant to 29 U.S.C. § 1104. As Defendants failed to abide by their fiduciary duties by creating and maintaining a discriminatory provision which

-9-

SA-12

interfered with and denied the attainment of rights accorded to Plaintiffs, they violated ERISA.

38.     The Plan's provision, and the failure of Defendants to modify or expel it, directly caused adverse effects on the interests of Plaintiffs and Class Members by prohibiting their access to medical benefits, which are vitally important to maintaining healthy and productive lives.

## CLAIMS FOR RELIEF

### COUNT I
*(Claim for Benefits)*

39.     Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

40.     Defendants unlawfully and discriminatorily interfered with the attainment of benefits to Plaintiffs in violation of ERISA § 510, 29 U.S.C. § 1140 by creating, condoning, and maintaining a discriminatory same-sex spouse exclusion under the Plan.

41.     The exclusion was intentional and purposeful as evinced by its specific reference to "same sex spouses" in the terms of the Plan.

42.     Because Plaintiffs were denied coverage based on this policy, they are entitled to relief under ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3).

### COUNT II
*(Claim for Breach of Fiduciary Duty)*

43.     Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

44.     At all relevant times, the Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

-10-

Class Action Complaint
for Violations of ERISA

SA-13

45.     Defendants breached ERISA § 404, 29 U.S.C. § 1104 by interfering with the attainment of rights afforded by ERISA, namely the right to medical benefits as per an ERISA covered plan with the intent of discriminating against the same-sex spouses of Plan participants, and those members of the Class and Subclass mentioned herein.

46.     Accordingly, Plaintiffs are entitled to appropriate equitable relief under ERISA § 502(a)(3) and/or additional benefits under ERISA § 502(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an Order:

A.     Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.     Declaring that Plaintiffs are entitled to benefits under ERISA;

C.     Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class and Subclass;

D.     Compelling Defendants to provide past and future benefits to participants and beneficiaries so entitled;

E.     Enjoining Defendants, together and individually, from any further violations of their duties under ERISA;

F.     Awarding Plaintiff and members of the Class and Subclass their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

G.     Awarding Plaintiff and members of the Class and Subclass such other and further relief as the Court may deem just and proper.

SA-14

DATED:     New York, New York
           June 19, 2012

                              NEWMAN FERRARA LLP


                    By: _____
                        Jeffrey M. Norton
                        Randolph M. McLaughlin
                        Debra S. Cohen
                        1250 Broadway, 27th Floor
                        New York, New York 10001
                        Tel: 212-619-5400
                        Fax: 212-619-3090
                        jnorton@nfllp.com
                        rmclaughlin@nfllp.com
                        dcohen@nfllp.com

                        *Counsel for Plaintiff*


-12-

SA-15

# Empire's Direct POS<sup>SM</sup> Plan for Saint Joseph's Medical Center Group 720660-A1, A2, A3, B1, B2, B3

Direct POS<sup>SM</sup>

Services provided by Empire HealthChoice HMO, Inc. and/or Empire HealthChoice Assurance, Inc., licensees of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans. In Connecticut, Anthem Blue Cross and Blue Shield is the trade name of Anthem Health Plans, Inc., an independent licensee of the Blue Cross and Blue Shield Association.

AT&T Direct is a registered mark of AT&T.  360° Health® is a registered service mark.

2/2012

SA-16

# Welcome!

Welcome to Empire's Direct POS (Point-of-Service). When you selected Empire, you made a smart choice. With your Direct POS, you have access to flexible, quality health care coverage. This benefit book explains how you get health care services, summarizes what your health plan covers and how we can help you make the most of your plan.

Si necesita ayuda en español para entender este documento, puede solicitarla sin costo adicional, llamando al número de servicio al cliente que aparece al dorso de su tarjeta de identificación o en el folleto de inscripción.

**Important: This is not an insured benefit Plan.** The benefits described in this benefit book or any rider or amendments hereto are funded by the Employer who is responsible for their payment. Empire BlueCross BlueShield provides administrative claims payment services only and does not assume any financial risk or obligation with respect to claims.

## GRANDFATHERED HEALTH PLAN

Empire believes this plan is a "grandfathered health plan" under the Patient Protection and Affordable Care Act (the Affordable Care Act). As permitted by the Affordable Care Act, a grandfathered health plan can preserve certain basic health coverage that was already in effect when that law was enacted. Being a grandfathered health plan means that this plan may not include certain consumer protections of the Affordable Care Act that apply to other plans, for example, the requirement for the provision of preventive health services without any cost sharing. However, grandfathered health plans must comply with certain other consumer protections in the Affordable Care Act, for example, the elimination of lifetime limits on benefits.

Questions regarding which protections of the Affordable Care Act apply and which protections do not apply to a grandfathered health plan and what might cause a plan to change from grandfathered health plan status can be directed to Empire at the telephone number printed on the back of your member identification card, or contact your group benefits administrator if you do not have an identification card.    For ERISA plans, you may also contact the Employee Benefits Security Administration, U.S. Department of Labor at 1–866–444–3272 or www.dol.gov/ebsa/healthreform. This Web site has a table summarizing which protections do and do not apply to grandfathered health plans.  For nonfederal governmental plans, you may also contact the U.S. Department of Health and Human Services at www.healthreform.gov.

## What's the Empire Direct POS Advantage?

The main advantage of this plan is choice. Choice that allows you to make smart decisions about your health care. Other advantages include:

- the ability to choose in-network or out-of-network care for most covered services.
- the freedom to self-refer to the network specialist of your choice for covered services.
- a comprehensive website, *www.empireblue.com*, for fast, personalized service in a confidential environment.
- lower costs when you use providers who are in Empire's participating provider network ("In-Network Providers").
- easy to use — usually no claim forms to file when you stay in-network.
- coverage when outside your service area.
- access to a large network of doctors and hospitals .
- providers that are reviewed for Empire's high standards of quality.

SA-17

# Details and Definitions

In this section, we'll cover the details you need to know to make the plan work for you. Use it as a reference to understand:

- Who is eligible for coverage under your plan
- How to file a claim and get your benefits paid
- Your rights to appeal a claim payment or Medical Management decision
- What we mean by certain healthcare terms

Knowing the details can make a difference in how satisfied you are with your plan, and how easy it is for you to use. If you have additional questions, please visit *www.empireblue.com* or call Member Services at 1-800-453-0113.

## Eligibility

### WHEN ARE YOU ELIGIBLE?

Your coverage under Empire's Direct POS plan begins on:
- Your group's effective date; or
- On the date you are eligible for group benefits as a new employee as determined by your employer.

Contact your Benefits Administrator for more information on eligibility rules.

### COVERAGE CATEGORY

- Your coverage category indicates how many people your plan covers. You may choose:
  - Individual, which covers only you
  - Family, which covers you and one or more of the following:
    - Your spouse
    - Dependent children (natural or adopted)

  Same sex spouse and domestic partners are NOT covered under this plan.

  Foster children are also not covered.

### ELIGIBLE DEPENDENTS

The following family members are eligible for coverage:

- Your spouse. Former spouses, as a result of a divorce or annulment of a marriage, are not considered eligible spouses.
- Your children, including natural children, legally adopted children, stepchildren, until the end of the month in which the child turns 26 years of age. Your children need not be financially dependent upon you for support or claimed as dependents on your tax return; residents of your household; enrolled as students; or unmarried. Children-in-law (spouses of children) and grandchildren are not covered.
- Your unmarried children, regardless of age, who are incapable of self-sustaining employment because of mental retardation, mental illness, or developmental disability as defined in the New York Mental Hygiene Law, or because of physical handicap, and who became so incapable prior to attainment of the age at which the dependent coverage would otherwise terminate.
- Your Eligible Dependents Through Age 29

  Your Plan increases the maximum coverage age through age 29 for young adult dependents who meet the eligibility requirements listed below. Dependents must also meet the eligibility requirements as described above.

  To be eligible for coverage through Age 29, the dependent must be:
  - a child of a covered member;
  - unmarried;
  - under age 30; and
  - not insured by or eligible for coverage through the dependent's own employer-sponsored group policy, whether insured or self-insured and
  - live, work or reside in New York State

  - The extended dependent coverage will terminate on the date the parent of the covered dependent ceases to be eligible for coverage. Coverage will also terminate if the dependent fails to meet any of the eligibility requirements listed above. In addition, the basis for termination, as indicated by the Plan, also applies.

**SA-18**

### FOR MORE INFORMATION

This notice does not fully describe continuation coverage or other rights under the Plan. More information about continuation coverage and your rights under the Plan is available from the Plan Administrator.

If you have any questions concerning the information in this notice or your rights to coverage, you should contact your Plan Sponsor or the Group Benefits Administrator responsible for COBRA administration for your group.

For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, contact the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) in your area or visit the EBSA website at www.dol.gov/ebsa. (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.)

### KEEP YOUR PLAN INFORMED OF ADDRESS CHANGES

In order to protect you and your family's rights, you should keep the Plan Administrator informed of any changes in your address and the addresses of family members. You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

### The Veterans Benefits Improvement Act of 2004

The Veterans Benefits Improvement Act of 2004, which amends the 1994 Uniformed Services Employment and Reemployment Rights Act (USERRA), extends the period for continuation of health care coverage as follows:

If a covered person's health plan coverage would terminate because of an absence due to military service, the person may elect to continue the health plan coverage for up to 24 months after the absence begins or for the period of service. Similar to COBRA, the person cannot be required to pay more than 102 percent (except where State requirements provide for a lesser amount) of the full premium for the coverage. If military service was for 30 or fewer days, the person cannot be required to pay more than the normal employee share of any premium.

### CONTINUING COVERAGE UNDER NEW YORK STATE LAW

If you are not entitled to continuation of coverage under COBRA (for example, your employer has less than 20 employees), you may be entitled to continue coverage under New York State Law. These laws vary from those under COBRA, but generally also require continued coverage for up to 18, 29 or 36 months.

Call or write to your employer or Empire to find out if you are entitled to continuation of coverage under the New York State Insurance Law.

### CONVERTING YOUR COVERAGE

Under certain circumstances, you may convert your group coverage to individual coverage with comparable benefits if such coverage is available from your group or, you may convert your group coverage to a Medicare supplement policy, if appropriate. However, not all your current benefits may be available when you convert your coverage. Please see your Benefits Administrator for details.

### ENDING AND CONTINUING COVERAGE

Your Employer/Plan Sponsor reserves the right to amend or terminate its group health plan coverage provided to you at any time without prior notice or approval. The decision to end or amend the health plan coverage may be due to changes in federal or state laws governing welfare benefits, the requirements of the Internal Revenue Code or ERISA, or any other reason.

Any amendment or termination may apply to all or any portion of the group health plan coverage and to all or to only a portion of the participants and beneficiaries.

### IF YOU BECOME DISABLED

If you or your covered dependents are totally disabled when coverage ends, coverage will continue for the disabled person for expenses related to the injury or illness that caused the disability. These benefits may continue for a period of 12 months following the date coverage ended.

Coverage will end when the disabled person:

- Is no longer totally disabled
- Has received maximum benefits from the contract

SA-19

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x

 3    JANE ROE and JANE DOE

 4                      Plaintiffs,

 5           -against-                       12 cv 4788

 6    EMPIRE BLUE CROSS BLUE SHIELD AND
      ST. JOSEPH'S MEDICAL CENTER
 7    et al.,

 8
                      Defendants.
 9
      ------------------------------------x
10

11                             United States Courthouse
                               White Plains, New York
12
                               November 7, 2012
13

14    B e f o r e:

15                      HON. EDGARDO RAMOS,
                               United States District Judge
16
      A P P E A R A N C E S:
17
      DEBRA COHEN
18    JEFFREY NORTON
              Attorneys for Jane Roe and Jane Doe
19
      ROBERT SCHER
20    DOUGLAS HEFFER
              Attorneys for Empire Blue Cross Blue Shield
21
      ARTHUR ROBB
22            Attorney for St. Joseph's Medical Center

23


24
      ANGELA A. O'DONNELL, RPR
25    Official Court Reporter
```

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Good morning, folks.  Be seated.
 3            THE CLERK:  Jane Roe, et al. versus Empire Blue
 4   Cross Blue Shield, et al.  Beginning with the plaintiff.
 5            MS. COHEN:  Debra Cohen for plaintiff.
 6            MR. NORTON:  Jeffrey Norton for plaintiff.
 7            MR. SCHER:  Robert Scher and Douglas Heffer on
 8   behalf of defendant, Empire Blue Cross Blue Shield.
 9            Good morning, your Honor.
10            THE COURT:  Good morning.
11            MR. ROBB:  Good morning, your Honor.  Arthur Robb
12   with Clifton Budd & DeMaria for defendant, St. Joseph's
13   Medical Center.
14            THE COURT:  Good morning, Mr. Robb.
15            Okay.  We are here at the request of plaintiffs
16   who wish to file a motion for preliminary injunction in
17   light of the Second Circuit's decision in the Windsor case.
18            I know that there is still outstanding a motion
19   that is yet to be briefed to dismiss the allegations in the
20   complaint by defendants, and I take it it's their view that
21   this didn't change things or the Windsor case doesn't change
22   things.
23            But either Ms. Cohen or Mr. Norton, one of you
24   want to tell me why you believe it does?  You can remain
25   seated, by the way.
```

SA-21

1          MR. NORTON:  Thank you, your Honor.  Good morning,

2     your Honor.

3          This is a followup to our last premotion hearing

4     we were talking about, the defendant's motion to dismiss.

5     At that time we made the argument that, in the absence of

6     DOMA, New York Law would control this case, this ERISA case,

7     and definition of marriage with regard to ERISA and with

8     regard to provision of benefits under the plan.

9          So, as soon as the *Windsor* case came down, in our

10    opinion, that's the end of the day on this issue, and that

11    now New York Law controls and there's no justifiable reason

12    for them not to provide these benefits under the plan.

13          THE COURT:  Talk to me, if you will, about the

14    standards for preliminary injunction.

15          MR. NORTON:  Sure.  So, the standards of the

16    Second Circuit are irreparable harm and likelihood of

17    success on the merits.  Here we can show irreparable harm

18    because just denial of medical benefits is, in itself,

19    there's Second Circuit cases and Southern District cases

20    saying the denial of medical benefits shows irreparable harm

21    or could be shown to be irreparable harm.  Access to choice

22    of benefits can be shown as a basis for irreparable harm,

23    anxiety and uncertainty of being without healthcare

24    coverage, the high cost of healthcare coverage outside the

25    plan.  Additionally, in this case we think the deprivation

SA-22

1   of rights shows irreparable harm and being subjected to

2   ongoing discrimination is, in itself, irreparable harm.

3   These are not matters that can be monetarily compensated.

4   Monetary compensation is not adequate here, in our opinion.

5          First of all, we're not seeking monetary

6   compensation.  This the a 23(b)(2) case.  We're seeking

7   injunctive relief.  So we're not even seeking monetary

8   compensation.  That wouldn't go against the irreparable harm

9   standard.  As far as --

10          THE COURT:  You're not seeking monetary

11   compensation, but if you can be made whole, if you will, if

12   you can be compensated monetarily, doesn't that put you out

13   of the box?

14          MR. NORTON:  I would assume, if the nature of your

15   case is seeking damages, that's one aspect here.  I mean,

16   that's something we can brief.  I haven't thoroughly fleshed

17   that out.  In my opinion, if we're not seeking monetary

18   damages, we're seeking injunctive relief for a class of

19   individuals who are being denied coverage based on a

20   discriminatory provision.  Therein lies the irreparable

21   harm.

22          THE COURT:  Can you point to someone who's been

23   denied medical benefits as a result of the policy?

24          MR. NORTON:  Our client.

25          THE COURT:  I mean, is your client under a

Case 14-1759, Document 45, 08/21/2014, 1301400, Page 25 of 48

SA-23

```
 1   doctor's care, in a hospital --
 2           MR. NORTON:  She has been denied -- well, our
 3   client has coverage under --
 4           THE COURT:  There's a difference between being
 5   denied coverage and being denied medical care, is I guess
 6   what I'm asking.
 7           MR. NORTON:  She hasn't been denied coverage.
 8           THE COURT:  Okay.
 9           MR. NORTON:  I'm sorry, your Honor.  She's not
10   been denied medical care.  The spouse -- one of our clients
11   is the spouse who is being denied coverage under the plan.
12   She does not currently have coverage.  She cannot afford
13   coverage.  Right now she is in limbo as far as healthcare
14   coverage.
15           THE COURT:  So I guess one of the questions in my
16   mind is, thank goodness she's healthy and not in urgent need
17   of medical care, but does that affect the irreparable harm
18   standard?
19           MR. NORTON:  I think the anxiety of being without
20   medical coverage, and if she were to go out and be forced to
21   purchase third-party coverage somewhere, which she cannot
22   afford, I think all these elements go to irreparable harm.
23           THE COURT:  I'm sorry, you say that you have case
24   law which suggests that the anxiety of being without
25   healthcare coverage could constitute irreparable harm?
```

```
1              MR. NORTON:  That's correct, your Honor.
2              THE COURT:  Okay.
3              MR. NORTON:  And that is the -- just give me, I'm
4    sorry, one moment.  I believe that's the LaForest case.
5    Yes.  In LaForest V Former Clean Air Holding Co., Inc., 376
6    F.3d 48 (2004).
7              THE COURT:  F.3d 48?
8              MR. NORTON:  F.3d 48, yes, (2004).  That is a
9    Second Circuit case and where the court said the reductions
10   would cause -- the argument was the District Court held that
11   plaintiffs had demonstrated irreparable harm by showing that
12   absent an injunction ordering Honeywell to provide premium
13   sufficient to secure guaranteed levels of benefits,
14   reductions in medical coverage would cause substantial risk
15   to plaintiff's health, severe financial hardship, the
16   inability to purchase life necessities and anxiety
17   associated with uncertainty.
18             THE COURT:  Do I take it that that case involved
19   individuals that were already covered and were facing
20   diminution of coverage of benefits?
21             MR. NORTON:  That is correct, your Honor.
22             THE COURT:  Okay.
23             MR. NORTON:  That's correct.  But they were
24   retirees.  There are other cases, there are a number of
25   cases that provide the lack of medical benefits or access to
```

SA-25

1    benefits can support irreparable harm.

2              THE COURT:  Okay.  I understand your, or I think I

3    understand your argument with respect to likelihood of

4    success on the merits.  But what about, the defendants raise

5    the point and I think it's a good one, about the urgency of

6    your application or the lack of urgency of your application?

7              I mean, you know, when you're moving for

8    preliminary injunction, typically something is urgent, it's

9    imminent.  Why can't this case just be handled in the

10   ordinary course?

11             MR. NORTON:  Who knows when -- people are

12   uninsured and who knows when some catastrophic injury can

13   happen to any member of the class, including our plaintiff.

14   She's not a particularly young woman.

15             THE COURT:  But that was the case when you brought

16   this lawsuit, and really what's changed, arguably, is that

17   your argument got a little stronger.  Right?  And this

18   wasn't a preliminary or temporary restraining order case,

19   wasn't a preliminary injunction case from the beginning, it

20   was a lawsuit seeking injunctive relief, but it wasn't an

21   emergency application, if you will.

22             MR. NORTON:  That's correct, your Honor.  And,

23   like you said, our case is stronger now.  We perhaps didn't

24   believe that we could meet that standard, the issues were

25   novel, we're still talking about a fiduciary responsibility.

1   And when this case started, it really had to do more with

2   the state of the law and the flux of the law and whether the

3   fiduciaries of the plan were fulfilling their duties to the

4   plan participants.

5          Now we have a clear signal that they're in

6   violation, acting in violation of law.  So we have a strong

7   basis, not that we wouldn't have wanted to get a preliminary

8   injunction right out of the gate, but now we have a strong

9   basis to do so.

10          THE COURT:  Okay.  Mr. Heffer or Mr. Scher or

11  Mr. Robb?

12          MR. ROBB:  Sure, your Honor.  Let me start at the

13  outset by affirming what your Honor had suggested.  It is

14  defendant's position that the Second Circuit decision in the

15  *Windsor* case changes nothing with respect to the merits of

16  this lawsuit for all the reasons underlying defendant's

17  contemplated motion to dismiss.

18          The Second Circuit decision strengthens an

19  immaterial argument because of the question of ERISA

20  preemption which we will present in the motion to dismiss.

21  Plaintiffs don't get to rely on a state law definition of

22  marriage in order to dictate plan terms in the absence of a

23  federal mandate.  And striking DOMA down as unconstitutional

24  is not the equivalent of a federal mandate requiring ERISA

25  plans to recognize same-sex marriage.

SA-27

1          What *Windsor* simply says is that it's

2   unconstitutional for the government to treat this group of

3   persons differently with respect to -- the case had to do

4   with, I think it was an estate tax.  So it relates to the

5   government, it doesn't relate to private citizens, it

6   doesn't relate to ERISA-covered plans.  And so, again --

7          THE COURT:  St. Joseph's is a private hospital?

8          MR. ROBB:  It's a not-for-profit, it's a

9   religiously affiliated not-for-profit and it's a self-funded

10  insurance plan, therefore, falling squarely within the ERISA

11  preemption clause.  And, again, the case law is very clear

12  that, in the absence of a federal mandate, the plan terms

13  govern, not state law definitions.  And so --

14         THE COURT:  Although, given the Second Circuit

15  determination that this category of individuals are now

16  subject to somewhat higher scrutiny, aren't the plaintiffs

17  right that this shifts the argument?

18         I take it St. Joe's would not, for example, argue

19  that they could treat African Americans differently from --

20         MR. ROBB:  No, your Honor.  It's a fair question.

21  The difference is, in their wisdom, Congress has chosen not

22  to enact legislation to affirmatively protect this protected

23  classification; whereas, in the case of race, national

24  origin, gender, Congress enacted Title VII, with respect to

25  disabilities, Congress enacted the Americans with

SA-28

1    Disabilities Act.

2            So, those are affirmative, federal mandates that

3    prohibit unlawful or -- prohibit discrimination on the basis

4    of those classifications and those federal statutes are not

5    preempted.  So, to answer your question, St. Joe's couldn't

6    discriminate on the basis of race or gender or national

7    origin because they would run afoul of affirmative federal

8    mandates.

9            THE COURT:  But wouldn't they run afoul of the

10   Constitution, as well?

11           I mean, do you need Title VII in order to not

12   discriminate against African Americans?

13           MR. ROBB:  Well, no, your Honor, because the equal

14   protection clause applies to government action.  Doesn't

15   apply to private citizens.  And *Windsor* struck down DOMA on

16   equal protection grounds.  The analogy, you may recall the

17   analogy I offered last time was the Equal Protection Clause

18   prohibited the government from discriminating on the basis

19   of race long before Title VII was enacted in 1964.  Prior to

20   1964, in their wisdom, Congress had chosen not to act, but

21   that was the state of the law at the time, private citizens

22   were afforded a greater freedom in that regard than the

23   government was.  And that's the state of law with respect to

24   this classification today, and the *Windsor* decision doesn't

25   change that.

```
 1              With respect to the preliminary injunction itself,
 2    again, for all those reasons, we don't see a likelihood of
 3    success on the merits.  And with respect to the irreparable
 4    harm, as your Honor suggested, this motion really isn't
 5    about any sense of exigency.  It really is an academic
 6    exercise.  There are no facts, no real facts, no
 7    circumstances on the ground that prompted this motion.  It's
 8    an academic exercise.  The weight of authority, a favorable
 9    decision came down and the weight of authority has shifted.
10    That doesn't at all go to whether or not there is an
11    irreparable harm.  And, clearly, there isn't any beyond the
12    speculative level which, of course, the courts say is
13    insufficient to warrant a preliminary injunction.  There has
14    to be some evidence showing an irreparable harm.
15    Concededly, if there were a real issue of an inability to
16    obtain medical treatment, that would be one thing.
17              And I think your earlier questions, your Honor,
18    speak to the distinction here.  If the argument is going to
19    be, look, I don't have healthcare coverage, therefore, I
20    have to go out of pocket to pay for my next physical, or
21    even if I break my leg or something more severe than that,
22    if I have to incur medical bills, well, money damages
23    compensate for that.  That's not the same thing as an
24    inability to obtain medical treatment.
25              THE COURT:  I don't know if you had the benefit of
```

SA-30

1    plaintiff's case law suggesting that anxiety relating to

2    lack of access to healthcare benefits may constitute

3    irreparable harm.  Can you speak to that?

4             MR. ROBB:  Well, I heard the quote and it sounded

5    as though the anxiety was one item mentioned in a laundry

6    list of real circumstances in that case, as your Honor had

7    suggested, retirees who had previously been covered and lost

8    coverage is a different set of circumstances than what we

9    have here.

10            So I don't know how this plaintiff will prove

11   anxiety related to a continued failure to provide coverage

12   that she never had.  So I don't know how they prove that

13   anxiety.  But from that quote I didn't get, and I'd have to

14   study the case to respond to it in a little more detail, but

15   I didn't get from that quote that, standing alone, the

16   anxiety related to the absence of coverage is sufficient to

17   demonstrate irreparable harm.  It sounded as though there

18   were actual issues of inability to obtain medical care from

19   what I heard from the quote, but I certainly would not

20   concede the point that, standing alone, anxiety related to

21   a -- and, again, not a failure to obtain medical care, but a

22   failure to obtain medical coverage.  Again, something that

23   can be compensated with money.

24            So I certainly -- I would reserve the right to

25   study the cases and respond to it in a little more detail;

SA-31

1    but I would tend to doubt that the cases support the

2    proposition that, standing alone, that anxiety is something

3    that would warrant preliminary injunction.

4              THE COURT:  What about, I know that there are,

5    again, I have not had the benefit of any additional briefing

6    on this, the argument, and there is a similar argument in

7    other contexts that the deprivation of equal treatment,

8    shall we say, constitutes a harm which cannot be

9    compensated?  They are alleging, obviously, that they are

10   being treated differently than their co-workers and that

11   treatment or that lack of equal treatment obviates the need

12   for them to prove monetary damages.

13             MR. ROBB:  Well, there are a couple of things

14   there.  One, the spouse in this case is not a co-worker.  I

15   don't know that that in and of itself would be a materially

16   distinguishing factor but it is a factor.

17             THE COURT:  No.  But the employee is being treated

18   differently than other employees whose families and spouses

19   are covered.

20             MR. ROBB:  Well, your Honor, the fact of the

21   matter is that, by their very nature, ERISA plans do

22   discriminate in what they cover and what they don't cover.

23   You know, again, I would reserve the right to study the

24   cases and address this issue in a little more depth, but I

25   do recall that there were a line of cases dealing with

SA-32

1    coverage of AIDS.  And I think the courts came down pretty

2    clearly to say, that's okay, you're allowed to do that.

3              By its nature, a plan has to make decisions about

4    you're not going to cover everyone and every thing.  So, by

5    their nature, ERISA plans draw lines.  And the mere fact

6    that you fall on the other side of that line, again, re --

7              THE COURT:  We're allowed to discriminate or we're

8    allowed to discriminate on the basis of an employee having

9    AIDS; did I hear you right?

10             MR. ROBB:  Correct.

11             THE COURT:  Was that about people coming into the

12   plan or folks that were already employed?  I mean, let's say

13   you've been a 20-year employee, and if you recall the case,

14   you're a 20-year employee and all of a sudden you acquire

15   AIDS, is the plan allowed to not provide you coverage?

16             MR. ROBB:  I'm getting into the hypothetical now,

17   your Honor.

18             THE COURT:  Oh, no, no, no.  I'm not asking

19   whether that was the case, the state of the cases that

20   you're recalling.

21             MR. ROBB:  I don't recall the specifics of it,

22   your Honor, but I guess, your Honor, at that point the

23   arguments are intertwined.  I mean, I would fall back on the

24   argument and say, but this may be discrimination but it's

25   not unlawful discrimination, and at least in the context of

SA-33

1    ERISA preemption, it's not unlawful discrimination.

2            And, so, certainly discrimination on a basis that

3    is not unlawful at the time certainly could not support a

4    finding of irreparable harm.

5            MR. SCHER:  Just two very minor points, your

6    Honor.  I think plaintiffs are confusing the issues of the

7    damages they may be seeking, which may not include monetary

8    damages, with the standard for a preliminary injunction,

9    which, as far as I'm aware, always includes a showing of

10   irreparable harm.

11           And on sort of a related issue to the irrelevance

12   of the DOMA decision, just to add one thing is, this plan

13   doesn't rely on DOMA for the definition of spouse or

14   marriage.  It's not a situation where the plan says spouses

15   are covered or spouses aren't covered and you have to look

16   and say, how do we define spouse.  And there's a question

17   of, do you look at DOMA, do you look elsewhere?  This plan

18   says same-sex spouses are not covered.  So it's clear as day

19   the terms of the plan.

20           THE COURT:  Mr. Norton.

21           MR. NORTON:  Well, I'll go address that point

22   first.  I mean, the plan obviously covers spouses.  The only

23   basis for that exclusion was that there was a -- they don't

24   have to say we rely on DOMA, the only basis for that

25   exclusion is the existence of federal law that allows them

SA-34

1    to define marriage that way and exclude coverage for

2    same-sex marriages.

3            THE COURT:  Is that the case?

4            MR. NORTON:  In our opinion, yes.  There's no --

5    ERISA law has traditionally looked, in the absence of

6    federal law, it looks to state law.  And courts routinely,

7    including the Supreme Court, with regard to defining

8    domestic relations issues, especially in marriage, in terms

9    of spouses, routinely and historically look to state law to

10   define those terms.

11           THE COURT:  Do you know whether that particular

12   provision postdates DOMA in this particular ERISA plan?

13           MR. NORTON:  I don't know, your Honor.

14           THE COURT:  Would that change the analysis?

15           Let's say it predates DOMA.  Do you think that

16   would change the analysis?

17           MR. NORTON:  I don't think it predates the New

18   York Law.  I think it was put into effect after the New York

19   Law.  I could be incorrect.  But I'm fairly certain it was

20   put into effect after the New York Law.  So it would

21   postdate DOMA.  But would that change my analysis?

22           THE COURT:  I guess the question was raised in my

23   mind because you said, you know, the only reason -- or I

24   don't want to put too strong language in here in your mouth,

25   I believe you said that the reason this language exists is

Case 14-1759, Document 45, 08/21/2014, 1301400, Page 37 of 48

SA-35

1   because of DOMA.

2          MR. NORTON:  Well, the reason -- well, the reason

3   they can maintain that language after the passage of the

4   Marriage Equality Act of New York is DOMA.

5          THE COURT:  Okay.  So go ahead.

6          MR. NORTON:  So going back to Mr. Robb's point on

7   making comparison between, you know, discriminate against an

8   AIDS patient, the discrimination he's talking about is the

9   particular elements of coverage.  What a plan will cover,

10  not who it will cover.  If a plan's covering spouses, it

11  can't say, you know, this -- you know, John Q's wife is not

12  covered under this plan but other people are.  For no

13  reason, just we don't like John Q.

14         THE COURT:  Isn't that the same thing, though?  I

15  mean, the plan can define this is what we're going to cover

16  and we're not going to cover this.  So we're not going to

17  cover people with AIDS, we're not going to cover same-sex

18  partners.

19         MR. NORTON:  They're not going to cover the

20  treatment related to those individuals, and I think that's

21  what those cases that he's speaking to, whether they're

22  mandated to cover certain treatments or whether -- a plan

23  doesn't have to cover contraception or abortion or AIDS

24  treatment like he says, but it doesn't mean you can exclude

25  certain individuals.

Case 14-1759, Document 45, 08/21/2014, 1301400, Page 38 of 48

1              And there is provisions in ERISA for that; 510,

2      section 510, there's 502(a)(2), 409, there are --

3              THE COURT:  What is 510?

4              MR. NORTON:  510 is the discrimination clause.

5      You can't put in place obstacles in the plan to deny certain

6      people benefits.  Use it in a discriminatory fashion to deny

7      benefits.  That's what we think this particular provision

8      does.

9              THE COURT:  If it's part of the definition of the

10     plan and it's being applied on a uniform basis, is that,

11     strictly speaking, discriminatory?

12             MR. NORTON:  If it's being put in place, if any

13     mechanism used is put in place to deny benefits to

14     participants intentionally to keep them from getting

15     benefits they would otherwise be entitled to is a violation

16     of Section 510.

17             THE COURT:  Okay.

18             MR. NORTON:  Going back.  They say if there's no

19     federal mandate, they can discriminate against anybody.

20     Well, it's not what about they can do.  Could they write in,

21     we're not going to cover sinners or democrats or people who

22     had been divorced in the past?  Sure.

23             Could they write it?

24             Would it violate ERISA?  It would.  Because

25     fiduciary responsibility runs to the plan participants, not

1    to the will of the plan sponsor.

2              THE COURT:  I'm sorry, say that again.

3              MR. NORTON:  The plan, the fiduciary

4    responsibility is with an eye single, cases says,

5    fiduciary's responsibility is with an eye single to the

6    participants, benefits to the interest of plan participants,

7    not to the plan sponsor, not to the ideas, the notions of

8    plan sponsor.  Acting in the best interest of the plan

9    participants, that's what a fiduciary's responsibility is.

10             THE COURT:  But I guess that's sort of -- I mean,

11   I see some circular aspect to that argument.  If the plan

12   says, you know, this is who's covered and this is what's

13   covered, as long as the fiduciary is implementing that plan

14   and in accordance with those definitions, how is that a

15   breach of fiduciary duty?

16             MR. NORTON:  Then I go back.  It is somewhat

17   circular.  So you go back to are they putting in specific

18   provisions in a discriminatory fashion?

19             Are they putting in plan language in violation of

20   Section 510?

21             Are they doing things that are going to harm plan

22   participants intentionally?

23             THE COURT:  Okay.

24             MR. ROBB:  May I address that last point, your

25   Honor?

1              ERISA itself in the case law speaks to the

2    circular analysis that your Honor aptly pointed out, and the

3    way ERISA deals with it is we say, wait a second, when an

4    employer creates a plan, that is not a fiduciary function.

5    So when we draw up a plan and we say these are the people

6    we're going to cover, we don't owe a fiduciary duty to the

7    people we decide not to cover.

8              And that's the problem with plaintiff's analysis

9    here.  Plaintiff argues we owe a fiduciary duty to Ms. Doe,

10   the spouse, as opposed to Ms. Roe, the employee.  Ms. Doe,

11   the spouse, was never a participant in our plan, because

12   when the plan was drawn up, a conscious decision was made

13   that we're not going to include that class of people.  We

14   don't owe a fiduciary duty to the universe.  A fiduciary

15   duty arises once the plan is drawn up.

16             And there are certain responsibilities, fiduciary

17   responsibilities that relate to administering the plan and

18   so forth.  But the case law is very clear that the initial

19   act of drawing up a plan and making decisions about what

20   we're going to cover or who we're going to cover, there's no

21   fiduciary responsibility that attaches to that function.

22             THE COURT:  Do you know the answer to the question

23   about whether this language predates or postdates DOMA, and

24   does it matter?

25             MR. ROBB:  I have a suspicion, but it's just a

SA-39

1   suspicion.  My suspicion is that it predates DOMA.  But

2   either way, your Honor, I think your question triggers a

3   thought in my mind, and that is to say it's an illustration

4   of why plaintiff's argument fails, because when as in if

5   DOMA, and I suspect the Supreme Court may weigh in on this

6   as well, but assuming DOMA is fully and finally stricken as

7   unconstitutional, where that leaves us in the terms of the

8   state of federal law is it leaves us where we were in 1995

9   or so prior to the enactment of DOMA.  That is, federal law

10  is silent.  And so, when counsel says these ERISA plans are

11  relying upon federal law, well, yeah, we are, or St. Joe's

12  did.  They relied upon ERISA and the preemption clause

13  contained therein which says, in the absence of a federal

14  mandate, the states, the individual states don't get to

15  impose their own 50 sets of laws on our plan.

16           THE COURT:  Is there anything else?

17           MR. NORTON:  I would just go back to the point

18  that ERISA's terms historically have been, certainly in the

19  areas of marriage and domestic relations, have been defined,

20  in the absence of federal law, an issue defined and guided

21  by state law.  It's not a matter of preemption, it's a

22  matter of working through ERISA to find definitions, because

23  state law has traditionally defined marriage, in ERISA

24  matters they looked to state law to define those terms.

25           THE COURT:  Okay.  Again, I think that puts us in

1   a situation where, otherwise, similarly situated employees

2   would be subject to different state definitions as to

3   whether or not they're married or whether or not their

4   spouse is covered.

5           MR. NORTON:  Actually, *Windsor* spoke to that, if I

6   understand what you're saying, is uniformity argument.  And

7   *Windsor* says uniformity is more found in the fact that

8   states define what a legal marriage is.  So, that's the

9   uniformity that it's a legal marriage.  Uniformity is that,

10  what's marriage?  It's a legal marriage.  What's a legal

11  marriage?  You have to look to the state law to determine

12  that.  Because domestic relations law is all over the board.

13  So, if you're just looking at a piece, *Windsor* speaks to

14  this, if you're just looking at a piece, marriage, spouse,

15  then what about the rest of domestic relations law of every

16  single state?

17          THE COURT:  Those arguments, I know I raised the

18  issue, that really goes to the merits.

19          MR. SCHER:  Your Honor, if I could just --

20          THE COURT:  Sure.

21          MR. SCHER:  -- very briefly.  With respect to

22  ERISA Section 510 argument, it's completely misplaced.

23  ERISA Section 510 clearly on its face has to do with sort of

24  retaliatory acts against people for exercising rights that

25  they already have under the plan.  It's almost like a

SA-41

1   whistle blower act.  The language itself says:  For

2   exercising any right to which he is entitled under the

3   provisions of an employee benefit plan.  That's not the case

4   here.

5            MR. NORTON:  We can brief that issue.

6            THE COURT:  Okay.  Mr. Norton, I don't think that

7   you win on a preliminary injunction motion.  The standard in

8   the Second Circuit is very clear that, you know, you have to

9   show irreparable harm.  I don't think that you're able to

10  show irreparable harm on the facts that you've presented.

11  So I think, at the end of the day, putting aside the merits

12  arguments, at the end of the day, you're not going to be

13  able to meet that standard.

14           Now, admittedly, I don't have a lot of case law

15  before me tending to show otherwise, and I don't know

16  whether or not you have case law that will put me in a place

17  where I'm able to determine, okay, you know, you have a

18  legitimate argument.  I don't think you'll be able to do

19  that.  So, I don't know that I'm going to -- I'm very much

20  leaning against allowing you to move for preliminary

21  injunction.

22           The anxiety argument is a curious one.  Again, I

23  haven't read the case, but it seems to me that unless there

24  is some sort of showing that Ms. Doe is being prevented from

25  accessing healthcare, I don't think you can establish

SA-42

```
1    irreparable harm.  And I don't know that you'll be able to

2    make that showing because there's nothing to prevent her

3    from obtaining healthcare, admittedly at some cost, it may

4    be more expensive, it may be whatever, but there wouldn't

5    appear to be anything to prevent her from accessing

6    healthcare if she needed it.  But we don't even have that.

7    Unless you want to make some additional arguments.

8              MR. NORTON:  We also have the issue of being

9    subjected to ongoing discrimination.  That's another prong.

10             THE COURT:  And, you know, and there, there when

11   we start getting into the merits, again, I'm not suggesting

12   that this hospital is correct, they may very well be on the

13   wrong side of history, but there appears to be nothing to

14   prevent them from discriminating as a private actor.

15   They're not a government agency and there's nothing in the

16   federal law to suggest that they are required at this point,

17   as a private entity, to treat same-sex marriages the same as

18   other marriages.

19             So, if we were to get into the likelihood of

20   success on the merits at this point, and, you know, we're

21   still not quite there, at this point it is unclear to me

22   that you will be able to establish a likelihood of success.

23             So, I think it's very much an uphill battle for

24   you, and I think that we are not in a different position

25   that we are today than we were on a day before *Windsor* was
```

SA-43

1    decided.  So I don't see the need for a preliminary

2    injunction at this juncture.

3              MR. NORTON:  Your Honor, with your permission,

4    perhaps we can submit a short letter brief to supplement

5    these cases, give us a couple days to do that, reserve your

6    decision.

7              THE COURT:  That may be helpful to me.  Again, I

8    don't know at the end of the day that you'll be able to meet

9    that test.

10             Where are we with respect to the other motion?

11             MR. ROBB:  Your Honor, we had requested and you so

12   ordered an application holding that briefing schedule in

13   abeyance in -- we anticipated if the motion for preliminary

14   injunction is made, there will be a substantial overlap of

15   the issues.

16             THE COURT:  Right.

17             MR. ROBB:  So we were all in agreement that the

18   briefing should be coordinated in some way that we were

19   intending to work out here today.  So, we're held in

20   abeyance on the motion to dismiss.

21             THE COURT:  Okay.  I guess that I would be -- that

22   case law should have been included in the letter that was

23   submitted, but I'm willing to give you an opportunity to

24   supplement that.  When do you think you could get that

25   letter in to me?

SA-44

```
1              MR. NORTON:  By Friday.

2              THE COURT:  Okay.  When do you guys want to

3    respond?

4              MR. ROBB:  The following Friday, the 16th.  Is

5    that fair?

6              THE COURT:  Any objection?

7              MR. NORTON:  No.

8              THE COURT:  Very well.  Let's do that.

9              Wondering whether we need to get back together.

10             MR. SCHER:  I guess, your Honor, the only thing

11   that remains out there is the briefing schedule.  I guess

12   one of two things could happen.  It could be that you don't

13   change your inclination and that there would be no motion

14   for a preliminary injunction, and what I guess you could do

15   after receiving both letters is, I think we're generally in

16   agreement from the last time that our briefing schedule

17   would be 30 days, 30 days and 15 days I think we said.  And

18   you could just set that or we can agree on a schedule.

19             If you change your mind, we had talked about,

20   because of all the substantial overlap, doing it as a motion

21   to dismiss, a response and a cross motion for a preliminary

22   injunction and then responses to that.  We just thought that

23   way there was the least briefing, the least amount of briefs

24   for you.

25             THE COURT:  That makes sense.  So why don't you
```

1    get the letters in and I will get back to you, hopefully

2    shortly thereafter, as to whether or not we're going to

3    adopt that.  That approach seems to make sense.  So if I

4    grant you leave to move for preliminary injunction, you'll

5    be able to do it by way of cross motion in response to the

6    motion to dismiss.

7              MR. NORTON:  That makes sense, your Honor.  Thank

8    you.

9              THE COURT:  Okay.  Anything further?

10             MR. NORTON:  No, your Honor.

11             MR. SCHER:  No, your Honor.

12             MR. ROBB:  No, your Honor.

13             THE COURT:  Very well.  Then I will look forward

14   to receiving your letter.

15             MR. NORTON:  Thank you.

16             MR. SCHER:  Thank you.

17             MR. ROBB:  Thank you, your Honor.

18             THE COURT:  Take care folks.

19             THE CLERK:  Court is in recess.

20             (Proceeding concluded at 10:13 a.m.)

21                   C E R T I F I C A T E

22   I, Angela A. O'Donnell, certify that the foregoing is a

23   correct transcript from the record of proceedings in the

24   above-entitled matter.

25             _____

Case 14-1759, Document 45, 08/21/2014, 1301400, Page 48 of 48

SA-46

1       Angela A. O'Donnell, RPR, Official Court Reporter

2  United States District Court, Southern District of New York

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25